UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LEROY MORRELL,

                                                             *Plaintiff*,

          -against-                                             9:22-CV-713
                                                                         (TJM/ML)

SGT. GLENN R. SAMPSON and
C.O. PATRICK H. BOULTER

                                                             *Defendants*.

**DEFENDANTS' REPLY TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE PURSUANT TO RULE 56.1(b)**

Pursuant to Rule 56.1(b) of the Local Rules of this Court, Defendants, Sgt. Glenn R. Sampson ("Sgt. Sampson") and C.O. Patrick H. Boulter ("C.O. Boulter") (collectively "Defendants"), reply to Plaintiff's Statement of Additional Material Facts in Dispute Pursuant to Rule 56.1(b) as follows:

    1.      Sgt. Sampson knew upon Plaintiff's arrival at Watertown Correctional Facility that Plaintiff was there in connection with an original conviction for attempted sexual abuse in the first degree. See, e.g., **Exhibit 2** to Affirmation of Edward Sivin ("Sampson Depo."), at 35:9-20, 39:6-18 (explaining that he "would have known [Plaintiff]" before the date of incident "if [he] was a sergeant on during [Plaintiff's] interview–when [Plaintiff] got off the transportation bus," since Sgt. Sampson was sometimes "assigned … [to] do [] interview[s]; and, "during [his] interview of an incoming incarcerated individual," he would check "the individual's crime of conviction … on the computer to get–to make sure they're telling me the correct answers for some of the questions."); compare id. at 38:19-23, 39:1-5 (admitting that "if a counselor was interviewing an

1

incarcerated individual inside the counselor's office," there "[should not] be security staff inside the office during the interview," but rather "[j]ust in that building … as a matter of procedure [so] that the interview with the counselor would be confidential"), with Plf. Depo. at 23:17–24:11 (testifying that during his interview with his counselor, Plaintiff "kind of cut that conversation short. It entailed two officers standing behind me during the conversation with the counselor, which was inappropriate. That's not supposed to happen. My personal information is being recited at that moment and there's supposed to be no officers there. …The only thing that was said to me at that present time was that I was not supposed to have any contact with … the mother and the daughter of my last conviction. And when he said that to me and I looked at the officers, I said, I don't–I don't–I don't want to talk to you anymore."), and Morrell Dec. ¶3 (describing initial interview).

**Response**:   Deny.  The record does not establish the existence of a dispute of fact. Plaintiff does not attest that Sgt. Sampson had knowledge of his original conviction for attempted sexual abuse in the first degree upon his arrival at Watertown Correctional Facility. See Morrell Dec. ¶ 3. Nor does the deposition of Sgt. Sampson establish that he knew about Plaintiff's original conviction, only that he would have known about an incarcerated individual's original crime of conviction if he was conducting interviews upon that individual's arrival at Watertown Correctional Facility. See Sampson Depo. 35:11-20, 39:9-12.

2. Sgt. Sampson and/or C.O. Boulter learned some time after Plaintiff's arrival at Watertown Correctional Facility that Plaintiff was there in connection with an original conviction for attempted sexual abuse in the first degree. See, e.g., id. at 28:15–29:6 (explaining that "[w]hen [he] walked into the cafeteria [the first day to report for his work assignment, a couple days prior

2

to the incident], the officers, there was seven of them there … one of them walked up and said [to Plaintiff], 'We know what the fuck you here for you piece of shit, don't fucking come in my mess hall.'"); Morrell Dec. ¶4 (declaring same and explaining that he wrote to deputy of programs and sergeant in response); **Exhibit 5** to Declaration of Edward Sivin ("Investigation Packet"), at 1-4 (documenting Plaintiff's earlier communications of fears of safety to officers); see also Plf. Depo. at 31:23 ("…[A]fter I had got hit a bunch of times, [C.O. Boulter pull[ed] a pin and [officers] reported to the housing unit and [] they were running to the housing unit [from the mess hall] like, 'We know who's out there, the rape O, we going to finish him off.' Things like, tree jumper, and I guess all of those derogatory terms but, you know, they were coming like they already knew who was beat up. …Q. What were the[] [officers] yelling when they were running? A. Yeah, that's the pedophile. We are going to finish him off.").

**Response**:   Deny.  The record does not establish the existence of a dispute of fact. Plaintiff does not attest that Sgt. Sampson or C.O. Boulter had knowledge of his original conviction for attempted sexual abuse in the first degree upon his arrival at Watertown Correctional Facility at any time before the incident giving rise to this matter. See generally Morrell Dec. Also, the claim that unknown, non-party officers purportedly knew about Plaintiff's original conviction does not create an issue of fact regarding Sgt. Sampson or C.O. Boulter's knowledge of Plaintiff's original conviction. Similarly, Plaintiff's alleged communication to "officers" about fear for his safety does not impute knowledge of Plaintiff's original conviction to Sgt. Sampson or C.O. Boulter.

3.     Incarcerated individuals convicted of sex crimes were at greater risk of attacks by other incarcerated individuals. See, e.g., Sampson Depo. at 39 (answering whether, "[i]n [his]

3

experience, in [his] many years with DOCCS, w[hether] individuals who were convicted of sex crimes [were] treated any differently from those who were convicted of other crimes"—specifically whether "those convicted of sex crimes be at greater risk of attacks by other incarcerated individuals"—by stating, "[t]hat happened sometimes, yes. …Some of the[] [other incarcerated individuals], if they heard sex crime, they automatically don't like that, so …Sometimes, yeah.").

**Response**:   Deny that the foregoing fact is material to the claims at issue in this action. The record does not establish the existence of a dispute of fact. See Sgt. Sampson Depo. 39:19-23 ("Q: In your experience, in your many years with DOCCS, were incarcerated individuals *treated* any differently from those who were convicted of other crimes?  A: That happened sometimes." (Emphasis added)); 40:9-12 ("Q: And in your estimation, would those convicted of sex crimes be at greater risk of attacks by other incarcerated individuals?  A: Not at all times, no.").

4.  Sgt. Sampson and C.O. Boulter visually observed the assault on Plaintiff on August 25, 2020. Compare Sampson Dec. (Dkt. No. 29-2), at ¶10 ("At no time did I observe anyone assault Plaintiff on August 25, 2020."), with Sampson Depo. at 34:1-3, 35:6-7 ("Q. … Do you have any independent recollection whatsoever of the events of August 25th of 2020? A No, sir …. Q. And do you have any recollection at all of Mr. Morrell on August 25th of 2020? A. No."), and Plf. Depo. at 50:7-11 ("Q. Okay. Did you lose consciousness at any point in time? A. Like I said, I don't know how much time it was. *I do know the sergeant was still there*.") (emphasis added), and id. at 54:24–56:5 ("When I stood up, after I got up off the floor, [Sgt. Sampson] was the first face I saw. … He was standing right in front of the door … they looked dead in my face before they left. … They were the first witnesses of how I looked after I got hit with all the master locks

4

repeatedly. Sergeant Sampson was the first person in the see me. … [W]hen I stood up in the little day room, he was right there from the outside of the door in the big day room,[1] leaving the housing unit. … He looked direct. … He was leaving the housing unit. He was walking by and while walking by, he looked at me and I looked at him."); compare also Boulter Dec. (Dkt. No. 29-3) at ¶8 ("At no time did I observe anyone assault Plaintiff on August 25, 2020."), with Morrell Dec. ¶8–11 (describing Sampson and Boulter's locations before and after the assault and declaring that they witnessed the assault), and Plf. Depo. at 61:4-24, 62:8-9 (testifying that "Officer Boulter [was] standing there when Sergeant Sampson was having a conversation with the porters" approximately "five or six feet" away, and that while Plaintiff was being assaulted, Boulter was "[s]tanding in the same spot … looking into the [same small day]room that [Plaintiff] w[as] in.").[2]

**Response**:  Deny.  The record does not establish the existence of a dispute of fact.  Sgt. Sampson can attest that he did not see anyone assault Plaintiff without remembering any of the events of August 25, 2020.  Those two things are not mutually exclusive.  Furthermore, Plaintiff's alleged observation of Sgt. Sampson being "the first face [he] saw" "after [he] got up off the floor" is not sufficient to create an issue of fact that Sgt. Sampson observed the alleged assault, especially because Plaintiff does not know how long it was from when he stopped being alleged hit until he got up off the floor.  See Plf. Depo. 55:2-4; 56:12-17 ("Q: How long was it from when you stopped being hit until you stood up?  A: I don't know.  Q: Okay.  Were the porters still in the room when you stood up?  A: No.").  This is equally true for any allegation that C.O. Boulter witnessed the

---

[1] See Sampson Depo. at 16:16–17:5 ("Q. If one is inside the large day room, can one see into the small day room? A. Yes. Q. Would that be through a glass pane that separates the large day room from– A. Yes. Q. –the small room? A. Yes. There were several glass panes. They were, you know, square panes, and then they had the metal framework in between them, but they were large panes so you could–you could see directly in there. Q. Would one be able to see the entire day room–I'm sorry, the entire small day room from inside the large day room? A. Yes.").

[2] See also supra note 1.

assault. See id. Any allegation that either Sgt. Sampson or C.O. Boulter witnessed the alleged assault is purely speculative.

5.  Sgt. Sampson was involved in the planning of and was aware of the assault against Plaintiff both immediately prior to and during the assault. See supra Plf.'s Resp. to Defs.' SOMF ¶¶22–27; compare Sampson Dec. ¶¶9, 18 (denying all involvement, and claiming that he first encountered Plaintiff while investigating the incident), and Boulter Dec. ¶¶7, 16 (declaring same), with Plf. Depo. at 39:15–41:21 (testifying in great detail about the conversation he observed Sgt. Sampson having with the group of unidentified assailants porters through the dayroom windows just prior to them reentering the small day-room and assaulting Plaintiff), and Morrell Dec. ¶¶6-11 (recounting circumstances surrounding assault), and Plf. Depo. at 47:16-24, 49:15-26, 64:6-25 (testifying that he tried to "get out of the [small day]room" and escape the assault by "reach[ing] to the side" to "grab the door [to the small dayroom]," but that the door was "locked" and was "still locked…when [he] got up," despite the fact that "[twelve o'clock] nighttime … is the only time that it is locked."), and Boulter Depo. at 16:10-21, 32:4-10 (confirming that the "the door between the big day room and the small day room" is open during the hours of 7 a.m. to 3 p.m., and that the door could only be locked or unlocked by "[t]he keys that [he] carr[ies] on [his] person" or "the sergeant[, who] would have a … master key," and testifying that there were "no other DOCCS staff in the I1 dorm at or around the time … [o]ther than [him]self and Sergeant Sampson.").

**Response**: Deny. The record does not establish the existence of a dispute of fact. Plaintiff admits that he did not hear any of the conversation between Sgt. Sampson and the porters. Plaintiff's Response to Defendants' State of Material Facts Pursuant to Local Rule 561(b) ¶ 16

6

(Dkt. No. 32-6).

6. C.O. Boulter falsely stated that Plaintiff came out of the bathroom of the I-1 dorm holding a towel to his head and bleeding and told C.O. Boulter that he fell in the bathroom and no one witnessed it. See supra Plf.'s Resp. to Defs.' SOMF ¶¶23–24; Morrell Dec. ¶¶10–12; see also Boulter Depo. at 40:18 (explaining that, after the incident, he eventually "did go into the bathroom and check [it] out … and then [] noticed some blood going across … the TV room," then found "more blood [in the small dayroom], which led to him to believe that "[Plaintiff] obviously wasn't telling me the truth"—namely, Boulter believed "that [Plaintiff] had been injured in the small day room and then made his way through the big day room into the bathroom," which he "told the sergeant.").

Response:   Deny.  The record does not establish the existence of a dispute of fact.  See Boulter Dec. ¶¶ 11, 13.

7. C.O. Boulter already knew how Plaintiff got injured when he asked Plaintiff what happened to his face on account of having just observed the assault take place. See Boulter Depo. at 23:3-9 ("I asked [Plaintiff] what happened and he told me [that he fell and hit his head on the sink]."); compare id. at 19:16-23 ("Q. What, if anything, do you recall observing [during the time when the incident occurred]? A. Nothing. Nothing out of the ordinary. Q Did you hear anything out of the ordinary? A No."), with Plf. Depo. at 62:23-25 ("[C.O. Boulter] was like, 'Hey, what's wrong with your face?' The same thing that been wrong with my face[,] you watched it."), and Morrell Dec. ¶11 (declaring that Boulter witnessed the assault), and id. at 66:23–67:2 ("[C.O. Boulter] said, 'Hey, what's going on with you? What's the matter with your face?' [I gave him] [n]o response, because I knew that he watched what just happened to my face."), and supra Plf.'s

7

Statement of Additional Disputed Facts ¶3 (discussing Boulter's proximity to and ability to observe the assault).

**Response**: Deny. The record does not establish the existence of a dispute of fact. See Boulter Dec. ¶¶ 7-8.

8. Sgt. Sampson, following the incident, knowingly generated a false report in which he implied that he did not know how Plaintiff received his injuries and that Plaintiff's injuries were consistent with fighting despite having been involved in the planning of and aware of the assault against Plaintiff both immediately prior to and during the assault. Compare **Exhibit 4** to Affirmation of Edward Sivin ("Inmate Misbehavior Report") at 1 ("Inmate Morrell remained uncooperative with the investigation and refused to explain how he received his injuries. I [Sgt. Sampson] have determined these injuries are consistent with being in a fight."), with supra Plf.'s Resp. to Defs.' SOMF ¶22 (discussing Sampson's proximity to and ability to observe the assault), and Plf.'s Statement of Additional Disputed Facts ¶5 (explaining Sampson's involvement in the planning of and awareness of the assault immediately prior to and during the assault), and Morrell Dec. ¶¶ 8–12 (declaring that Sampson witnessed the assault and Plaintiff's injuries resulting therefrom).

**Response**: Deny. The record does not establish the existence of a dispute of fact. See Exhibit B to Sampson Dec.

Dated: Albany, New York
November 10, 2023

           LETITIA JAMES
           Attorney General of the State of New York
           *Attorney for Defendants*

           By: s/ *Matthew J. Gallagher*
           Matthew J. Gallagher
           Assistant Attorney General, of Counsel
           Bar Roll No. 701111
           The Capitol
           Albany, New York 12224-0341
           Telephone: (518) 776-2284
           Email: Matthew.Gallagher@ag.ny.gov