**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

LEROY MORRELL,

                         Plaintiff,

v.                                               9:22-cv-713 (AMN/ML)

SGT. GLENN R. SAMPSON and
C.O. PATRICK H. BOULTER,

                         Defendants.

_____

**APPEARANCES:**                             **OF COUNSEL:**

**SIVIN, MILLER & ROCHE**          **EDWARD SIVIN, ESQ.**
20 Vesey Street, Suite 1400         **DAVID ROCHE, ESQ.**
New York, NY 10007              **GLENN D. MILLER, ESQ.**
_Attorneys for Plaintiff_

**STATE OF NEW YORK – ATTORNEY**   **MATTHEW GALLAGHER, ESQ.**
**GENERAL'S OFFICE**              Assistant Attorney General,
Litigation Bureau                  of Counsel
The Capitol
Albany, New York 12224

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

      Plaintiff Leroy Morrell was formerly incarcerated at Watertown Correctional Facility

("Watertown"), in Watertown, New York, a New York Department of Corrections and Community

Supervision ("DOCCS") prison.  He brings this civil rights action pursuant to 42 U.S.C. § 1983

("Section 1983") against Defendants Sgt. Glenn R. Sampson, a DOCCS sergeant at Watertown,

and C.O. Patrick H. Boulter, a DOCCS correction officer at Watertown (collectively,

"Defendants").  Plaintiff alleges that Defendants violated his Eighth Amendment rights against

cruel and unusual punishment by failing to protect him from, and failing to intervene into, an assault by multiple unidentified inmate-porters at Watertown on August 25, 2020.  *See* Compl., Dkt. No. 1.  Plaintiff contends that this assault was "directed, promoted, instigated, encouraged" by Defendants, and that Defendants had reasonable opportunities to intervene to stop the assault but failed to do so.  *Id.* at ¶¶ 14, 16.

Defendants move for summary judgment seeking to dismiss Plaintiff's Complaint in its entirety.  *See* Dkt. No. 29.  Plaintiff opposes the motion in part, Dkt. No. 32, and Defendants have filed a reply.  Dkt. No. 33.  For the following reasons, Defendants' motion is granted in part and denied in part.

## II.    BACKGROUND

In August of 2020, Plaintiff arrived at Watertown after violating parole in connection with a 2010 conviction for attempted sexual abuse of a minor in the first degree.  *See* Dkt. No. 29-1 at 15-24.[1]  Plaintiff contends that when he arrived at Watertown, there were two correction officers present inside the room with him during his initial meeting with his counselor, and that these officers overheard details about his original conviction of attempted sexual abuse in the first degree.  Dkt. No. 32-3 at ¶ 3.  Plaintiff further contends that when he reported to the mess hall a few days later to begin his work assignment, he was told by the officers working there that they "knew what [he] was in there for," and that he was a "piece of shit" who "should not come into their mess hall."  *Id*. at ¶ 4.  Plaintiff asserts that he then left the mess hall and wrote to the Deputy of Programs at Watertown about the situation.  *Id.*  Plaintiff does not allege that any of the officers he had encountered up until this point included either Defendant.

_____

[1] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

**A.  Plaintiff's account of circumstances surrounding August 25, 2020**

Plaintiff asserts that on August 25, 2020, he proceeded to the program building and was told by the area sergeant that he would be given a new work assignment.  *Id.* at ¶ 5.  Plaintiff contends that later that day, he was inside the small day room of the I-1 dorm after placing a call to his wife and was on a tablet writing a note to her when he saw Defendant Sampson come into the housing unit and begin speaking with approximately five inmates who worked as porters in the I-1 dorm.  *Id.* at ¶ 6.  Plaintiff admits that he did not hear any of the conversation between Defendant Sampson and the porters.  Dkt. No. 32-6 at ¶ 16.

Plaintiff contends that immediately after the inmates finished speaking with Defendant Sampson, they rushed into the small day room where Plaintiff was sitting and began assaulting him by striking him with socks filled with master locks.  Dkt. No. 32-3 at ¶ 7.  Plaintiff asserts that the assault lasted for a couple of minutes, but that no one intervened to stop it.  *Id.*  Plaintiff contends that immediately before he was assaulted, "both Sgt. Sampson and C.O. Boulter were directly in [his] field of view.  Sgt. Sampson was talking to the group of porter inmates who assaulted [him] and C.O. Boulter was standing about six feet away."  *Id.* at ¶ 8.  Plaintiff maintains that during the assault, he tried to open the door to the small day room in order to escape, but it was locked from the outside.  *Id.* at ¶ 9.  Plaintiff asserts that in his experience, "the door to the small day room is never supposed to be locked during that time of day."  *Id.*  Plaintiff attests:

> 10. When I got up immediately after being assaulted, C.O. Boulter was standing in the same spot he was before the assault, fully in view, and Sgt. Sampson was even closer, looking directly at me through the dayroom windows.
>
> 11. Although I did not see Sgt. Sampson or C.O. Boulter while I was being assaulted (because my attention was focused on my assailants and trying to defend myself), both Sgt. Sampson and C.O. Boulter were in my direct field of view both immediately before and immediately after I was assaulted. Therefore, I am certain that they witnessed me being assaulted.

3

*Id*. at ¶¶ 10-11.

Plaintiff contends that after the assault, he was "bleeding profusely from [his] face and mouth, and later found out that [his] orbital bone was fractured." *Id.* at ¶ 12. Plaintiff asserts that he was eventually able to exit the small day room by going through the door that led to the dorm. Dkt. No. 29-1 at 69-70. As Plaintiff left, he encountered Defendant Boulter, who was standing in the doorway. *Id.* Defendant Boulter purportedly said to Plaintiff, "Hey, what's going on with you? What's the matter with your face?" *Id.* Plaintiff contends he did not respond because he "knew" that Boulter had witnessed the attack. *Id.* At this time, Defendant Boulter "pulled a pin" which summoned numerous correction officers to that location. *Id.* Plaintiff contends that these other correction officers came running and screaming: "Yeah, it's the rape O. [W]e [are] going to finish him off." *Id.* Plaintiff also contends that he heard these officers yelling "that's the pedophile. We are going to finish him off." *Id.* at 75. Plaintiff maintains that the officers were also using "slurs" but that he could not "distinguish" what exactly they were saying. *Id.* at 75-76. When these other officers arrived, the officers said to Plaintiff to put his "fucking face on the wall, you piece of shit," and told Plaintiff that if he breathed wrong, he would not make it to medical. *Id.* at 77-78.

Plaintiff maintains that at no point did he tell any officer, including Defendant Boulter and Defendant Sampson, that he sustained his injuries by slipping in the bathroom and that nobody witnessed it, as Defendants contend (*see, supra*). Dkt. No. 32-3 at ¶ 13. Plaintiff further maintains that after the assault, he was escorted by officers, including Defendant Sampson, to the infirmary. *Id.* Plaintiff alleges that he "was threatened by multiple officers during the escort, who told [him] not to report the assault, and to instead tell the nurse that [he] had fallen in the shower." *Id.* Plaintiff maintains that "[t]hey told me that they were 'looking for a reason' to hurt or kill [him]." *Id.* Plaintiff asserts that because he "was afraid of Sgt. Sampson and the unknown officers' and threats

4

to [his] life, [he] did not tell the nurse how [he] sustained [his] injuries." *Id.*; *see also* Dkt. No. 29-1 at 78 ("I was given a story to give to [the medical staff] and I was told if I gave them any other story . . . .  Basically, they just kept telling me like I was going to die that day, to be honest. Everything led up to we'll kill you here."); *id.* at 82 ("Q. Okay. At some point, were you given a story to tell the folks in medical?  A. Yes. That I fell in the shower and that was the story.").

Plaintiff maintains that he was taken to Samaritan Medical Center and then returned to Watertown after being discharged.  Dkt. No. 32-3 at ¶ 14.  Plaintiff testified at his deposition that later on the night of August 25, 2020, Defendant Sampson "came right back and walked into the medical room and was like, 'Didn't we give you adequate medical attention?'  He said, 'You were lucky motherfucker because that phone[2] was in here.'"  Dkt. No. 29-1 at 110.

Plaintiff asserts that the next day he was interviewed by an investigator from the DOCCS Office of Special Investigations ("O.S.I."), and he "described the assault of the previous night." Dkt. No. 32-3 at ¶ 15.  Plaintiff is unsure of the official result of the O.S.I. investigation because he was transferred to Riverview Correctional Facility thirty days later.  *Id.*  Plaintiff contends that he pled guilty to the Misbehavior Report written by Defendant Sampson charging him with fighting on August 25, 2020 "solely because [Plaintiff] feared for [his] life, did not believe [he] would receive a fair hearing, and felt that it would be wiser to let the O.S.I. investigation play out while [he] spent thirty days in the S.H.U."  *Id.* at ¶ 16.

### B.  Defendants' account of circumstances surrounding August 25, 2020

Defendant Boulter attests that on August 25, 2020, he was the I-1 Dorm Officer on the 7 a.m. to 3 p.m. shift.  Dkt. No. 29-3 at ¶ 6.  Defendant Boulter asserts that "[a]t no time did [he] prompt, direct, instigate, or encourage an assault against Plaintiff on August 25, 2020, or on any

---

[2] This is in reference to the telephone used to place a video call to outside medical professionals.

other date," and "[a]t no time did [he] observe anyone assault Plaintiff on August 25, 2020." *Id.*

at ¶¶ 7-8.  Rather, he avers:

> 9. At approximately 12:35 p.m. on August 25, 2020, an incarcerated individual came to my desk and said that another incarcerated individual was bleeding in the bathroom.
>
> 10. I left my desk area and headed toward the bathroom.
>
> 11. As I approached the bathroom, Plaintiff exited the bathroom with a towel on his head, and I observed he appeared to be bleeding from his head.
>
> 12. I then brought Plaintiff to my desk area and called the sergeant, Glenn Sampson, to the dorm.
>
> 13. I asked Plaintiff what happened, and he told me that he fell and hit his head on the sink in the bathroom and no one witnessed it.
>
> 14. Sgt. Sampson arrived on the unit to investigate the incident, and Plaintiff was subsequently taken to the infirmary.
>
> 15. I had no further interaction with Plaintiff on August 25, 2020.

*Id.* at ¶¶ 9-15.

Defendant Sampson attests that on August 25, 2020, he was the Housing Sergeant on the 7

a.m. to 3 p.m. shift.  Dkt. No. 29-2 at ¶ 6.  As part of his duties, he would make rounds on the

housing dorms to confirm that officers were performing their duties and speak with incarcerated

individuals, if necessary.  *Id.* at ¶ 7.  This included making rounds on the I-1 dorm, and Defendant

Sampson performed rounds on the I-1 dorm on August 25, 2020.  *Id.* at ¶ 8.

Defendant Sampson asserts that at no time did he prompt, direct, instigate, or encourage an

assault against Plaintiff on August 25, 2020, or on any other date, and that at no time did he observe

anyone assault Plaintiff on August 25, 2020.  *Id.* at ¶¶ 9-10; *see also id.* at ¶ 18.  Rather, he avers:

> 11. I encountered Plaintiff on August 25, 2020 because I investigated an incident involving Plaintiff.

12. At or around 12:35 p.m., I was called to I-1 dorm by C.O. Patrick Boulter who informed me that he observed Plaintiff exiting the bathroom with injuries to his head and face.

13. I subsequently interviewed Plaintiff, who stated to me that he fell in the small day room in the I-1 dorm and no one witnessed it.

14. To further investigate the incident and rule out a fight between Plaintiff and other incarcerated individual[s], I ordered the upper bodies of the other incarcerated individuals on the I-1 dorm be visually and (sic) checked for signs of fighting. The upper-body check was performed with negative results.

15. Plaintiff was subsequently seen by medical staff at Watertown.

*Id.* ¶¶ 11-15.

Defendant Sampson also attaches a copy of the Unusual Incident Report concerning the August 25, 2020 incident, and Defendant Sampson's memorandum memorializing his interaction with Plaintiff on August 25, 2020. *See id.* at ¶¶ 16-17, and Exs. A & B. The Unusual Incident Report indicates that upon Plaintiff's return from the hospital, he was interviewed by Sgt. Weldon and stated that he knew who caused his injuries but he was not going to tell. *Id.*, Ex. A at 6. Sgt. Weldon determined that Plaintiff's injuries were consistent with fighting with an unknown inmate. *Id.* Sampson's memorandum recounts the same facts as stated in his Declaration, and states that Plaintiff "has injuries consistent with being in an altercation and is being issued a misbehavior report for fighting." *Id.*, Ex. B at 9.

## III.   STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a

[factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. V. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.   DISCUSSION

### A.  Section 1983 Conspiracy Claim

Defendants argue they are entitled to summary judgment dismissing the Section 1983 conspiracy claim to the extent Plaintiff asserts one in the Complaint. Defendants maintain that

Plaintiff cannot establish the existence of an agreement, which is necessary to prove a conspiracy claim, and instead relies on conclusory allegations and pure speculation.  Dkt. No. 29-5 at 5. Plaintiff does not specifically respond to this aspect of Defendants' motion, nor was a conspiracy explicitly alleged in the Complaint.

In order to establish a Section 1983 conspiracy claim, a plaintiff must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  To the extent a conspiracy claim can be drawn from the Complaint, it would be based on Plaintiff's claim that Defendants directed, prompted, instigated, and encouraged an assault against him.  Dkt. No. 1 at ¶ 14.  But, as Defendants note, that Plaintiff saw Defendant Sampson speaking with the group of porters before they allegedly assaulted Plaintiff does not establish an agreement.  Plaintiff does not specifically allege that there was an agreement between the Defendants and the porters to assault Plaintiff.  *See generally* Dkt. No. 1.  Further, Plaintiff admits that he did not hear any of the conversation between Defendant Sampson and the porters, *see* Dkt. No. 32-6 at ¶ 16, and admits that Defendant Boulter was not part of that conversation*, id.* at ¶15.  Therefore, there is no issue of fact as to any conspiracy claim against Defendants.  *See, e.g., Scotto v. Almenas*, 143 F.3d 105, 115 (2d Cir. 1998) (finding mere allegations of contact and communication between alleged co-conspirators to be insufficient to survive summary judgment).

Regardless, by not specifically opposing Defendants' argument, Plaintiff is deemed to have abandoned any Section 1983 conspiracy claim.  *See AVA Realty Ithaca, LLC v. Griffin*, 652 F. Supp. 3d 255, 264-65 (N.D.N.Y. 2023); *see also Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary

judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (citation omitted).  Further, even if not abandoned, "[i]n this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a 'modest' burden." *Quinn v. United States*, 946 F. Supp. 2d 267, 276 (N.D.N.Y. 2013) (citations omitted).  As discussed, Defendants' underlying motion papers establish such facial merit.  Thus, Defendants are entitled to summary judgment dismissing any Section 1983 conspiracy claim.[3]

## B.  Eighth Amendment Excessive Force Claim

Next, Defendants argue that they are entitled to summary judgment dismissing any Section 1983 excessive force claim against Defendants.  Dkt. No. 29-5 at 6.  Again, Plaintiff does not respond to this specific argument, nor is it explicitly mentioned in the Complaint.

To establish an Eighth Amendment claim for excessive force, an incarcerated individual must prove "(1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated 'contemporary standards of decency.'"  *Clark v. Gardner*, 256 F. Supp. 3d 154, 166 (N.D.N.Y. 2017) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999)).  Defendants' argument is simple: Plaintiff does not contend that Defendants applied any force directly to Plaintiff, but instead, contends that he was assaulted by unknown porters in the small day room at Watertown.  Defendants also argue that any such allegation that

---

[3] This does not preclude Plaintiff from arguing at trial that circumstantial evidence indicates that Defendants and the porters came to a tacit agreement to attack Plaintiff for purposes of establishing liability under the remaining Eighth Amendment claims.

Defendants encouraged or assisted that assault is purely conclusory and speculative.  *See supra* Section IV.A.

Again, by failing to respond to this specific argument, Plaintiff is deemed to have abandoned any Section 1983 excessive force claim against Defendants.  *See AVA Realty Ithaca, LLC*, 652 F. Supp. 3d at 264-65.  Even if not abandoned, such a claim is dismissed because Defendants' argument in support of dismissal has facial merit.  *Quinn*, 946 F. Supp. 2d at 276 (citations omitted).[4]

### C.  Eighth Amendment Failure-to-Protect Claim

Defendants next contend the Complaint should be dismissed to the extent it includes an Eighth Amendment failure-to-protect claim.  Dkt. No. 29-5 at 6.  Plaintiff opposes summary judgment on this theory.[5]  To the extent the Complaint states a failure-to-protect claim, this Court

---

[4] The Court notes that claims of excessive force have been sustained on similar allegations*, see Young v. Coughlin*, NO. 93 CIV.0262 DLC, 1998 WL 32518, at * 7 (S.D.N.Y., January 29, 1998) (correctional officers' "sexually suggestive" comments to plaintiff in the presence of a large number of other inmates may state an Eighth Amendment claim if they incited other inmates to assault plaintiff); *Watson v. McGinnis*, 964 F. Supp. 127, 132 (S.D.N.Y. May 1, 1997) ("a guard's intentionally calling a prisoner a snitch in order to cause him harm by other inmates states an Eighth Amendment excessive force claim"), but nevertheless finds that Defendants' argument meets the low bar of facial merit.  Again, the dismissal of this claim does not preclude Plaintiff from arguing at trial that circumstantial evidence indicates that Defendants and the porters came to a tacit agreement to attack Plaintiff for purposes of establishing liability under the remaining Eighth Amendment claims.

[5] To the extent the Complaint alleges both failure-to-protect and failure-to-intervene claims, the claims must be addressed separately.  At base, both claims require a showing that an officer acted with "deliberate indifference" to a "substantial risk of serious harm" to an inmate or detainee.  *Sanchez v. Nassau Cnty.*, 662 F. Supp. 3d 369, 405 n.35 (E.D.N.Y. Mar. 11, 2023).  However, a failure-to-intervene claim is more appropriate where defendant officers are alleged to have failed to protect a plaintiff from an ongoing attack, either by another officer or an inmate.  In contrast, a failure-to-protect claim typically involves allegations that defendant officers had reason to know a plaintiff was at severe risk of serious harm (typically from other inmates), and yet, did nothing to prevent the future harm.  *See, e.g., Bradshaw v. Fletcher*, 9:19-CV-0428 (BKS/TWD), 2023 WL 2863905, at *11 (N.D.N.Y. Feb. 23, 2023)*.

finds Plaintiff has failed to establish a material issue of fact capable of sustaining such a claim for trial.

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996). "Where a prison inmate has alleged that he was not protected by prison officials, ... 'an inmate who is injured as a result of a prison official's deliberate indifference to his safety may maintain a damage action for the deprivation of his civil rights[.]'" *Snider v. Dylag*, 188 F.3d 51, 54 (2d Cir. 1999) (quoting *Stubbs v. Dudley*, 849 F.2d 83, 86 (2d Cir. 1988)).

Generally, deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The deliberate indifference standard for liability has an objective and subjective element. *See Hayes*, 84 F.3d at 620; *see also Ross v. Correction Officers John & Jane Does 1-5*, 610 F. App'x 75, 77 (2d Cir. 2015) (summary order). The objective element requires that a plaintiff "demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm." *Hayes*, 84 F.3d at 620. The subjective test requires that the defendants acted with a "culpable state of mind." *Ross*, 610 F. App'x at 77 (citing *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 360 (S.D.N.Y. 2009) (citing *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (internal citation and quotation marks omitted)).

Plaintiff has established, under the objective test, that "he [was] incarcerated under

conditions posing a substantial risk of serious harm." *Hayes*, 84 F.3d at 620.  First and foremost, allegations of an assault by another inmate indicate that Plaintiff faced serious risk of harm.  *See Mirabella v. Correction Officer O'Keenan*, 15-CV-142S, 2016 WL 4678980, at *4 (W.D.N.Y. Sep. 7, 2016) (finding where risk ultimately manifested in an alleged "slashing incident" with another inmate, the objective prong is satisfied); *see also George v. Burton*, No. 00 CIV. 143(NRB), 2001 WL 12010, at *3 (S.D.N.Y. Jan. 4, 2021) ("Certainly, the 'pervasive risk of harm' requirement is met when prison guards simply stand by and permit an attack on an inmate by another inmate to proceed.") (citation omitted).

Moreover, the record confirms that Plaintiff faced a risk of serious harm.  Defendant Sampson's deposition testimony acknowledges that, in his experience, individuals incarcerated due to sex crimes were sometimes subject to increased aggression by other inmates.  Dkt. No. 32-2 at 40.  Finally, while the record does not contain direct evidence of other inmates (as opposed to officers) being made aware of the nature of Plaintiff's crimes, it is replete with circumstantial evidence suggesting the same.  *See, e.g.,* Dkt. No. 32-6 at 9 (detailing Plaintiff's deposition testimony explaining officers publicly threatened Plaintiff due to the reason for his incarceration when he first arrived at the mess hall for his work assignment); *id.* at 11 (citing Plaintiff's deposition testimony that Defendant Sampson spoke with the unidentified assailants directly before the assault took place); *see also Dean v. Robinson*, 656 F. Supp. 3d 400, 409 (W.D.N.Y. 2023) ("identifying a prisoner as a child molester in an incarcerated setting might create a risk of harm that is sufficiently serious to give rise to a constitutional violation").  Thus, Plaintiff has identified "evidence [of substantial risk] on which the jury could reasonably find for him." *Centi v. Fedigan*, 413 F. Supp. 3d 171, 176 (S.D.N.Y. Sep. 12, 2019) (citation omitted).  Even if the allegations of the assault did not satisfy the objective prong alone, and even if the circumstantial

evidence in the record were insufficient to establish Plaintiff faced substantial risk of serious harm, Defendant has conceded that Plaintiff has satisfied the objective element of his failure-to-protect claim.  Dkt. No. 33 at 4.[6]

However, under the subjective element, the parties contest whether the named Defendants were aware of the nature of Plaintiff's crimes, and thus, whether they had reason to know Plaintiff was at risk of targeting by other inmates.  Four pieces of evidence and allegations might suggest Defendants were aware of the risk: (1) "two correction officers . . . overheard that Plaintiff was convicted of a sex crime," (2) Plaintiff alleges he was told by non-party officers that they knew of his conviction in the mess hall, (3) Plaintiff's allegations that he reported his mess hall confrontation to a non-party sergeant, and (4) Defendant Sampson's testimony that he might have met Plaintiff because he interviewed incarcerated individuals when they entered the facility and checked their records of conviction.  *See* Dkt. No. 32-6 at 19.

However, none of the evidence provides grounds for finding that the specific named Defendants were aware of Plaintiff's reason for incarceration, let alone that they acted indifferently towards the risk.  Instead, the record merely reflects that some other officers knew of the nature of Plaintiff's conviction.[7]  No evidence exists illustrating a more than speculative chance that Defendants were aware of the possible danger facing Plaintiff prior to the assault in question. While it is not impossible to imagine that the named Defendants were made aware of the nature of Plaintiff's conviction, either through other officers or through Defendant Sampson's occasional

---

[6] Defendant argues the objective element is satisfied "only to the extent the Defendants knew about the alleged assault," but in doing so, Defendants conflate the objective and subjective standards. Defendant's knowledge is relevant to the subjective prong.

[7] Importantly, Defendant Sampson did not testify in his deposition that he did in fact interview Plaintiff.  He merely noted he sometimes interviews new arrivals to the facility and that Plaintiff might have been one.  Dkt. No. 33-1 at 2.

role in interviewing new arrivals, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] [] insufficient." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004). As such, to the extent one can be read from the Complaint, the Court dismisses the failure-to-protect claim based on the Defendant's conduct prior[8] to the assault in question.

### D.  Eighth Amendment Failure-to-Intervene Claim

In contrast, Plaintiff has asserted a material issue of fact as to his failure-to-intervene claim, and thus, the Court denies summary judgment on this basis.

Within the general deliberate indifference framework, where a plaintiff alleges that a defendant failed to *intervene in an ongoing attack* by another inmate which the defendant witnessed, courts consider additional factors. Generally, given that there can be no question that an officer watching an attack by another inmate is aware of at least some danger, "[i]naction by a corrections officer to intercede and halt an attack by a fellow prisoner is a sufficient basis for deliberate indifference." *Williams v. Connell*, 6:17-CV-750 (TJM/ATB), 2018 WL 3468213, at *4 (citation omitted). But officers are not made liable merely by witnessing such attacks. "In the context of a failure-to-intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Rosen*, 667 F. Supp. 2d at 360 (internal quotation marks omitted). "A reasonable opportunity to intervene means that the attack must have

---

[8] Of course, whether Defendants knew of a risk to Plaintiff prior to the assault is a separate inquiry from whether they were aware during the assault itself. Though Plaintiff argues that Defendants' alleged witnessing of the assault itself can satisfy the subjective component here, that circumstance is best considered under the failure-to-intervene claim. Indeed, the overall fact pattern and Plaintiff's arguments suggest to this Court that the Complaint may not have stated a claim for failure-to-protect based on the events prior to the assault. However, given that the issue was raised in briefing, the Court has addressed the claim.

been of sufficient duration that an officer present at the scene would have had a reasonable opportunity to attempt to prevent the attack from continuing.  However, in circumstances where a correction officer reasonably concludes that further intervention would threaten the health and safety of all concerned, including correctional staff, his failure-to-intervene is not a constitutional violation." *Id.* (quoting *Williams v. Russo,* No. 01–CV–6401, 2009 WL 185758, at *4 (W.D.N.Y. Jan. 26, 2009)).

First, there exists a disputed issue of fact as to whether Defendants watched the assault on Plaintiff take place.  Defendants argue that the evidence does not support a conclusion that Defendants watched the assault, relying heavily on Plaintiff's contention that he did not see them as the attack was taking place because he was focused on defending himself.  Dkt. No. 29-5 at 5-8.  Plaintiff asserts that both Defendants were in locations in which they could see where Plaintiff was assaulted, and Plaintiff asserts that both were in his field of vison immediately before and after the assault. Dkt. No. 32-7 at 26.  Thus, although Plaintiff admits that he did not see either defendant while he was being assaulted, he is "certain that they witnessed [Plaintiff] being assaulted" given Defendants' physical proximity to the event.  Dkt. No. 32-3 at ¶ 11.

Considering these allegations, "there is an issue of fact as to what, if anything Defendants saw of the fight." *Rosen*, 667 F. Supp. 2d at 360.  Such an issue of fact is material to the Defendants' ultimate liability, and thus, is sufficient to preclude summary judgment on its own. *See Salaam v. Stock*, 9:19-cv-00689-AMN-TWD, 2023 WL 3853811, at *7 (N.D.N.Y. Feb. 27, 2023), *report and recommendation adopted*, 2023 WL 3579770 (N.D.N.Y. May 22, 2023) (denying summary judgment on failure-to-intervene claim where a reasonable jury could find that a defendant "watched as [plaintiff] was attacked … and did nothing"); *Stephens v. Venettozzi*, 13-CV-5779 (RA) (DF), 2016 WL 929268, at *16 (S.D.N.Y. 2016), *report and recommendation*

16

*adopted*, 2016 WL 1047388 (noting, in a failure-to-intervene context, that "[defendant]'s proximity to the alleged assault, and his status as a sergeant (and thus a supervisory officer), further support the inference that he could have curtailed [the violent conduct]."); *McCoy v. Goord*, 255 F. Supp. 2d 233, 262 (S.D.N.Y. 2003) (noting that correction sergeant's proximity to assault and supervisory position gave him the opportunity to prevent use of force).

Moreover, Plaintiff asserts that: (1) Defendant Sampson spoke with the assaulters immediately before the attack; (2) the assault lasted for several minutes; (3) the attack caused Plaintiff substantial injury because the inmates were striking him with socks containing locks; and (4) when Plaintiff tried to escape through the door where Defendants were located, he found that the door had uncharacteristically been locked. *See generally* Dkt. No. 32-3. From these facts, a reasonable inference could be drawn that Defendants were not only aware of the assault as it was happening but "instigat[ed] and encourage[d] a violent attack" which "plausibly suggests *at least* deliberate indifference." *See Jenkins v. Officer S (Downstate)*, No. 19-CV-10728 (KMK), 2021 WL 4392611, at *5 (S.D.N.Y. Sep. 24, 2021) (emphasis added) (citation omitted). While Defendants dispute these allegations, at a minimum, the parties' varying versions of events "reflect the precise type of 'he said, she said,' on which the court cannot … take a side at the summary judgment stage." *Ruderman v. Law Office of Yuriy Prakhin*, No. 19-cv-02987 (RJF) (RLM), 2022 WL 20538757, at *1 (E.D.N.Y. Jan. 25, 2022) (citing *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010)).[9]

---

[9] Defendants note Plaintiff's inability to give an exact timeline on the events before and after the assault and the possible inconsistency in Plaintiff's story regarding the door to the room in which he was assaulted being locked and the assaulters' ability to leave the room. Dkt. No. 33 at 5-6. But "[a]s tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted." *Franklin v. Oneida Corr. Facility*, No. 03-CV-1452 (LEK), 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008).

Defendants' motion is denied because, construing the evidence in the light most favorable to Plaintiff and drawing reasonable inferences on his behalf, Plaintiff presents sufficient evidence for a reasonable jury to conclude "(1) that [each Defendant] observed or had reason to know that the Plaintiff was involved in a physical altercation with another inmate; (2) that [each Defendant] had a reasonable opportunity to intervene to prevent the attack from continuing; (3) that in failing to intervene [each Defendant was] deliberately indifferent to a substantial risk of harm to Plaintiff; and (4) that [the officer's] deliberate indifference to a substantial risk of harm [] caused Plaintiff some harm." *Rosen*, 667 F. Supp. 2d at 360 (citation omitted).[10]  Accordingly, Defendants' motion in this regard is denied.

### E.  Qualified Immunity

Defendants contend that if Plaintiff's Eighth Amendment claim is not dismissed, they are entitled to summary judgment based on qualified immunity.  Dkt. No. 29-5 at 9.  Plaintiff opposes this aspect of Defendants' motion.  *See* Dkt. No. 32-7 at 30-35.  For reasons that follow, Defendant's motion for summary judgment on qualified immunity grounds is denied at this time.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation omitted).  Qualified immunity is a "difficult concept [which] looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct." *Stephenson v. Doe*, 332 F.3d 68, 80 n.15 (2d Cir. 2003) (citation omitted).  The doctrine is further complicated in a deliberate indifference context.  Though an official's motive is irrelevant for most qualified

---

[10] The Court notes that Defendants have not alleged that concerns for their own safety prevented them from intervening, but rather that they did not witness the attack on Plaintiff.

immunity inquiries, with a deliberate indifference claim, the Court must assess intent because it is a component of plaintiff's affirmative case. *See, e.g., Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001) (citing *Crawford-El v. Britton*, 523 U.S. 574, 587–89, 592 (1998) ("Thus, although evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case.")).

"A court's qualified immunity analysis must address two questions.  First, did the defendant violate a statutory or constitutional right?  Second, was the right "clearly established" at the time of the challenged conduct?" *Gordon v. Drummond*, 19 Civ. 8405 (GBD) (GWG), 2021 WL 5314604, at *10 (S.D.N.Y. Nov. 16, 2021) (citing *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020)). "Courts retain discretion to addresses these questions in whichever order they see fit." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

As discussed above, there remain disputed issues of fact that preclude a summary disposition as to whether Defendants violated Plaintiff's Eighth Amendment rights by failing to intervene into an assault.  These questions of fact defeat an application of qualified immunity at this stage. *See, e.g., Robinson v. Taylor*, No. 9:16-CV-0285 (BKS/DJS), 2017 WL 4174795, at *6 (N.D.N.Y. 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.'") (citation omitted); *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 725 (S.D.N.Y. 2017) (denying summary judgment where "there are unresolved facts that are material to a determination of the reasonableness of the officers' conduct"); *see also Jefferson v. Reddish*, 718 F. App'x 94, 96 (2d Cir. 2018) (summary order) ("[G]enuine disputes of material fact preclude our determining as a matter of law whether defendants are entitled to qualified immunity.").

Further, on the second question, the Supreme Court has explained that a right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1978). While those rights "should not be defined at a high level of generality," *White*, 137 S. Ct. at 552 (citation omitted), "the very action in question [need not have] previously been held unlawful." *Anderson,* 483 U.S. at 640 (citation omitted). Rather, "in the light of pre-existing law[,] the unlawfulness must [have been] apparent." *Id.* There is no requirement that there be "a case directly on point." *White*, 137 S. Ct. at 551 (citation omitted).

In August of 2020, when Plaintiff was assaulted, it was clearly established that Defendants had a duty to intervene in an assault on an incarcerated individual where "[they] [were] [] witness[es] to the attack and in a position to stop it." *See Blake v. Israel Sexton*, 12 Civ. 7245 (ER), 2016 WL 1241525, at *7 (S.D.N.Y. Mar. 24, 2016); *see also Villante v. Vandyke*, No. 9:04-CV-759 (FJS/DRH), 2008 WL 163596, at *3 (N.D.N.Y. Jan. 15, 2008) ("it was well-established that [defendants] could not stand by and watch one inmate assault another"). An officer "who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful." *Paul v. LaValley*, 712 F. App'x 78, 79–80 (2d Cir. 2018) (summary order) (citing *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433 n.11 (2d Cir. 2009)).

Here, "upon the facts alleged by Plaintiff, no reasonable correction officer would mistake Defendants' constitutional obligation to take reasonable steps to stop the assault once they saw it begin." *Jhagroo v. Brown*, No. 16 CV 3426-LTS-SDA, 2020 WL 419450, at *24-25 (S.D.N.Y.

Jan. 27, 2020) (internal citation omitted).   Accordingly, Defendants' motion in this regard is denied.[11]  Defendants are free to raise qualified immunity at trial.

## IV.   CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' Motion, Dkt. No. 29, is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** Plaintiff's claims of unlawful § 1983 conspiracy, are **DISMISSED**; and the Court further

**ORDERS** Plaintiff's Eighth Amendment excessive force claims against Defendants are **DISMISSED**; and the Court further

**ORDERS** Plaintiff's Eighth Amendment failure-to-protect claims against Defendants are **DISMISSED**; and the Court further

**ORDERS** Defendant's motion is denied in all other regards and that Plaintiff's failure-to-intervene claims against Defendants will proceed to trial; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 24, 2024
     Albany, New York

*Anne M. Nardacci*
Anne M. Nardacci
U.S. District Judge

---

[11] As Plaintiff argues, Defendants' qualified immunity argument is largely duplicative of their arguments against Plaintiff's claim, and in this regard could be denied at the threshold.  *See Jenkins*, 2021 WL 4392611, at *5 (denying qualified immunity where Defendant "only repeats arguments from elsewhere in his brief" and "Defendant has not identified any ambiguity in the applicable legal standard.") (internal quotation marks and citations omitted).